Hon. Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNIVERSITY OF WASHINGTON MEDICAL CENTER, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN SEBELIUS,[1] <br><br> Defendant. | No. C07-0394RAJ <br><br> ORDER |

## I. INTRODUCTION

This matter comes before the court on cross-motions for summary judgment (Dkt. ## 12, 15). The court has considered the parties' briefing and supporting evidence, and has heard from counsel at oral argument. For the reasons explained below, the court DENIES Plaintiffs' motion (Dkt. # 12) and GRANTS the Defendant's motion (Dkt. # 15).

---

[1] Kathleen Sebelius became the Secretary of the United States Department of Health and Human Services on April 29, 2009, and is substituted here for former Secretary Michael Leavitt.

ORDER – 1

## II. BACKGROUND

The Plaintiffs, eighteen Washington hospitals, filed this lawsuit to challenge a decision of the Defendant Secretary of the United States Department of Health and Human Services. In short, the Secretary decided that only certain groups of low-income patients could be counted when calculating a particular Medicare payment, and Plaintiffs contend that two other groups of low-income patients should have been counted as well.

Medicare Part A is a federal health insurance program that reimburses providers for certain medical services provided to eligible beneficiaries, primarily the aged and disabled. *See*, *e.g.*, 42 U.S.C. § 1395(c). Medicaid (also known as Title XIX), is a medical-aid program that provides federal funds to assist states in providing medical assistance to low-income individuals who meet certain financial and non-financial eligibility criteria. *See* 42 U.S.C. §§ 1396-1396v; 42 C.F.R. § 430.0; s*ee also Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006). A state that wishes to participate in the Medicaid program must propose a state plan to the Secretary. *See* 42 U.S.C. § 1396a(a). A state plan is:

> a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of Title XIX, the regulations in this Chapter IV, and other applicable official issuances of the Department. The State plan contains all information necessary for [the Centers for Medicare and Medicaid Services] to determine whether the plan can be approved to serve as a basis for Federal Financial Participation (FFP) in the State program.

42 C.F.R. § 430.10. The Medicaid Act requires that state plans cover certain categories of individuals, and allows the states to elect to cover other groups as well. 42 U.S.C. § 1396a(a)(10). State plans must cover the "categorically needy": individuals who qualify based on their eligibility for assistance under either the Aid

to Families with Dependent Children program or the Supplemental Security Income program. *See Spry v. Thompson*, 487 F.3d 1272, 1274 (9th Cir. 2007). Participating states may choose to provide coverage to the "medically needy": those whose incomes are above the poverty line, but who lack the resources to pay for necessary medical care. *See id*.

At a state's discretion, state plans may also cover other groups of individuals. 42 U.S.C. § 1396a(a)(10)(A)(ii). So long as their plans meet the broad Medicaid requirements in 42 U.S.C. § 1396a, states have discretion to determine which services will be covered, who will be eligible, and the payment levels for each service. 42 C.F.R. § 430.0. A state plan must be approved by the Secretary in order to be eligible for federal payments. 42 U.S.C. §§ 1315, 1396, 1396c.

Recognizing that providers who serve a disproportionately high share of low-income patients will not be able to serve enough insured patients to offset the costs of providing that care, Congress directed the Secretary to create a payment adjustment, known as the Disproportionate Share Hospital (DSH) adjustment. *See* 42 U.S.C. § 1395ww(d)(5). A hospital's "disproportionate share" percentage determines whether the hospital is entitled to a DSH adjustment and how large the adjustment should be. *See* 42 U.S.C. § 1395ww(d)(5)(F)(v). The disproportionate share percentage is the "sum of two fractions expressed as percentages and serves as a 'proxy' for all low-income patients." *Jewish Hospital, Inc. v. Secretary of Health and Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994).

The first fraction, known as the Medicare proxy, is not at issue in this case. The second fraction, known as the Medicaid fraction or proxy, expresses the number of non-Medicare low-income patients served by a hospital as a percentage of the hospital's entire patient population. Congress has defined the formula for calculating the Medicaid fraction as:

> [A] fraction (expressed as a percentage), <u>the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter</u>, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). (The subchapter XIX referenced in this definition is subchapter XIX of the Social Security Act, entitled "Grants to States for Medical Assistance Programs," also known as the Medicaid Act or Title XIX.)

DSH payments are administered by the Secretary, but the Secretary has delegated many administrative responsibilities related to the Medicare and Medicaid programs to the Centers for Medicare and Medicaid Services ("CMS"), which in turn delegates many of the audit and payment functions to organizations known as Fiscal Intermediaries. *See* 42 U.S.C. §§ 1395h, 1395u. At the end of each fiscal year, a service provider must submit a cost report to its Fiscal Intermediary, showing the costs it incurred during the year and the appropriate share of those costs to be apportioned to Medicare. 42 C.F.R. § 413.24(f). The Intermediary reviews the cost report, makes adjustments as it deems necessary, and issues a final notice of program reimbursement to the provider. 42 C.F.R. § 405.1803. A provider may appeal the notice to a Provider Reimbursement Review Board ("PRRB").

During the years under appeal, Washington's state plan covered the categorically needy and the medically needy, as required by Medicaid. Washington also created programs covering the Limited Casualty-Medically Indigent ("MI") (low-income patients without health insurance who have an emergent medical condition) and the General Assistance Unemployable ("GAU") (low-income

individuals unemployable for 90 days), and these populations are at the center of the dispute in this case. Administrative Record ("AR") at 31-32.

For the cost-reporting periods between 1994 and 2000, the Fiscal Intermediary for Plaintiffs refused to include MI and GAU patient days in the calculation of the Numerator of the Medicaid fraction. The aggregate Medicare DSH adjustment would have been approximately $31 million higher if MI and GAU patients had been included in the calculation. Plaintiffs appealed to the PRRB as a group, and the PRRB reversed the Fiscal Intermediary. The Fiscal Intermediary appealed, and the acting CMS administrator reversed the PRRB's decision based on his finding that MI and GAU patients were not eligible for medical assistance under Medicaid. The Plaintiffs then filed this lawsuit.

According to the Plaintiffs, Washington's state plan included the categorically needy, the medically needy, MI, and GAU patients — such that all four populations should be counted toward the Medicare DSH payment calculation. The Secretary contends that only the categorically needy and medically needy were actually eligible for Medicaid under the state plan, and that the MI and GAU programs were separate programs not eligible for direct federal reimbursement, and thus the Secretary properly counted only the two populations covered by Washington's Medicaid plan. Thus, this appeal requires the court to answer one question: Did the MI and GAU populations receive medical assistance for purposes of the Numerator formula?[2] Answering this question is a two-part process: The

---

[2] Plaintiffs attempt to argue that the Secretary should be bound by the stipulations (AR 30-40) entered when this matter was before the PRRB. According to the Plaintiffs, the stipulations prevent the Secretary from arguing its position to this court. But the Ninth Circuit has previously held that the Secretary is not necessarily bound by PRRB stipulations because the Secretary is not a party to those proceedings. *See Loma Linda Univ. Med. Ctr. v. Leavitt*, 492 F.3d 1065, 1074 (9th Cir. 2007). The stipulations are contained in the administrative record before this court, but do not necessarily assist the court in determining whether the administrator's decision was supported by substantial evidence because the stipulations are not themselves evidence. Though Plaintiffs argue that allowing the Secretary to abandon the stipulations at this stage would discourage parties from entering into stipulations that streamline administrative procedures, parties may

court must first interpret the statute to determine what the Numerator statute means by "medical assistance." Then the court must review the Secretary's factual finding that the MI and GAU populations do not receive "medical assistance."

## III. DISCUSSION

A. **Standards of Review.**[3]

There is a two-step standard for judicial review of an agency's interpretation of the statutes it administers. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 47 U.S. 837 (1984). First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 47 U.S. at 842. If it has, then the Court "must give effect to the unambiguously expressed intent of Congress" and no deference to an agency interpretation is required. *Chevron*, 47 U.S. at 842-43. If the statute is silent or ambiguous as to the precise question at issue, the reviewing court determines "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 47 U.S. at 843.

Judicial review of a factual finding by the Secretary is authorized by the Medicare statute, 42 U.S.C. § 1395oo(f)(1), in accordance with the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. Under the APA, a court reviews an agency's final decision for substantial evidence based on the administrative record. *See* 5 U.S.C. § 706(2)(E). Substantial evidence is "more than a mere scintilla, but less than the weight or preponderance of the evidence." *Richardson v. Perales*, 402

---

continue to do so at their own risk, in light of the case law stating that those stipulations are not binding on the Secretary.

[3] Though the initial cross-motions briefed the issue before the court as one of statutory interpretation, at the April 24, 2009 oral argument, it became clear that the parties' dispute also included a fact question: whether the MI and GAU patients received medical assistance under Washington's state Medicaid plan, as the Secretary had found below they were not. Thus, the court ordered the parties to provide supplemental briefing on the standard of review for the Secretary's factual findings. The parties agree that the Secretary's factual findings should be reviewed for substantial evidence. *See* Pltfs.' Supp. Br. (Dkt. # 36); Def.'s Supp. Br. (Dkt. # 35). Though the Plaintiffs included a discussion of the arbitrary and capricious standard of review, they do not dispute that factual findings are reviewed for substantial evidence. *See* Pltfs.' Resp. Br. (Dkt. # 37) at 2.

U.S. 389, 401 (1971). It must be the amount and quality of evidence "as a reasonable mind might accept as adequate to support a conclusion." *Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229, 233 (9th Cir. 1988).

B.  **"Medical Assistance" Means "Payment of Federal Funds"**

The Numerator formula calculates "the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Title XIX], but who were not entitled to benefits under [Medicare] Part A." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Many courts have analyzed the Numerator formula to determine the meaning of "eligible." *See Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1266 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 912 F. Supp. 438 (E.D. Mo. 1995), *aff'd* 83 F.3d 1041 (8th Cir. 1996); *Jewish Hosp.*, 19 F.3d at 276. So far as this court is aware, only two other cases have presented the legal question in this case: whether the Numerator formula counts those patients who are included in an approved state plan but not eligible for Medicaid under federal statute. *See Adena Regional Medical Center v. Leavitt*, 527 F.3d 176 (D.C. Cir. 2008), and *Phoenix Memorial Hospital v. Leavitt*, No. 2:07-cv-1720 (D. Ariz. Jan. 12, 2009). Based on an analysis of the meaning of "medical assistance" as used in the Numerator formula, the court agrees with the *Adena* and *Phoenix Memorial* courts that the Numerator formula is unambiguous in that it only counts patients who are eligible for Medicaid under federal statute.

The Medicaid Act specifically defines "medical assistance" as "payment of part or all of the cost of" enumerated services. 42 U.S.C. § 1396d(a). The Medicare DSH statute expressly refers to the Medicaid subchapter, and the Social Security Act uses the term "medical assistance under a State plan approved under [Title XIX]" in

various places. *See Adena*, 527 F.3d at 180 (citing 42 U.S.C. §§ 1320a-7b(a)(6), 1382h(b)(3), 1396a(a)(10)(E), 13966n(i)(1)). As noted in *Adena*, courts are to presume that identical words found in different parts of the same act have the same meaning. *Adena,* 527 F.3d at 180 (citing *Atl. Cleaners & Dyers, inc. v. United States*, 286 U.S. 427 (1932), and *Sullivan v. Stroop*, 496 U.S. 478 (1990)). Because the Social Security Act uses "medical assistance" to mean the payment of federal funds toward certain services, a person is eligible for "medical assistance" for purposes of the Numerator calculation only if they are eligible for federal funds under Medicaid.

The Plaintiffs' interpretation of the statute is not consistent with the Social Security Act's definition of "medical assistance." They instead urge the court to view the phrase "medical assistance under a State plan" as a whole, emphasizing that Washington's state plan covers patients not eligible for Medicaid. While it may be true that the state plan covers some not eligible for Medicaid, the use of the defined term "medical assistance" makes clear that the relevant issue is whether the state plan provides for federal funds under Medicaid for the patient's services — not simply the patient's inclusion in a state plan. Thus, the court concludes that the Secretary's interpretation of the Numerator formula is correct because it is consistent with the specific definitions found in the Social Security Act.

Because the Numerator unambiguously refers to "medical assistance under a State plan" to mean payment of federal funds for certain services, the court will now turn to review the administrator's factual finding that the services provided under the MI and GAU programs were not eligible for federal funds.

**C. The Secretary's Finding That MI and GAU Patients Were Not Eligible for Payment of Federal Funds is Supported by Substantial Evidence.**

The administrator's final decision provides multiple reasons why MI and GAU patients are not considered eligible for medical assistance under Medicaid. First, the administrator addresses references to MI and GAU patients in Washington's state plan. Below, the hospitals argued that because the state plan refers to MI and GAU patients, those patients are considered covered by the state plan. The administrator found otherwise because he found that the state plan does not refer to the *eligibility* of MI and GAU for Medicaid benefits, but refers to MI and GAU patients only in the context of counting them toward the calculation of a different payment to hospitals than the one at issue in this case. *See* AR 13, 1361-72. Because reimbursing a hospital is not the same as covering an individual, the administrator found that the references to MI and GAU patients did not establish that they were "eligible" under the state plan.

Beyond the language of the state plan itself, the administrator cited three pieces of evidence to support his determination. First, the administrator looked to Washington's 2003 DSH program certification documents, which were compiled to certify the number of patients' Medicaid-eligible days for purposes of calculating, among other things, the Medicare DSH payment that year. In those certification documents, the State reported that MI and GAU patients were not counted because they were not eligible for federal matching funds at that time:

> While some federal matching funds were at one time provided to state for MI/GAU client hospital services, these funds came in the form of a grant for uncompensated care, but did not make a client Title XIX eligible. MI/GAU clients are not included in the count of Title XIX eligible days.

AR 1573. The administrator also noted that the State's website listed the MI and GAU programs as "state-only" or "state-funded" programs. *See* AR 1324-25.

ORDER – 9

Furthermore, the administrator cited a 2005 e-mail drafted by a Washington Department of Social and Health Services employee, who, in a response to a question about GAU patients' eligibility for Medicaid:

> The information provided in this response is informal and not binding. . . . [DSHS] does not consider [GAU patient days] as attributable to patients who are eligible for Medical Assistance under the State Plan. . . . Patients who are eligible for the GAO program are eligible for a state medical assistance program, but they are not eligible for Medicaid ([Title XIX]).  Payments for the GAU program are funded using DSH funds as a financing mechanism, but the program is a state entitlement authorized in state law.

AR 1333.  According to the Secretary, the sum of this evidence adequately supports the agency decision.

The Plaintiffs dispute the relevance of the 2003 certification memo, the website information, and the e-mail because those documents are dated after the time relevant to this appeal.  The Plaintiffs also discount the probative value of the e-mail because its author expressly stated that it was an informal and non-binding opinion.  The court agrees that the post-2000 evidence is not particularly helpful to the court's analysis because the Plaintiffs do not challenge the Medicare DSH payment calculation method after 2000.  Thus, the court looks to the language of the state plan to determine whether it supports the administrator's decision.

At the outset, the court notes that Washington's state plan has separate sections for eligibility criteria for individuals and for Medicaid DSH payments. Furthermore, different eligibility criteria apply to different programs within the state plan; some programs within the state plan provide for federal matching funds to subsidize assistance given to individuals, and some programs do not provide for federal matching funds.  For purposes of calculating Medicaid DSH payments, however, the state plan counts both patients in programs that receive federal funds and patients in programs that do not.  Just because a patient is counted for purposes

ORDER – 10

of the Medicaid DSH payment does not mean that the patient is eligible for Medicaid benefits, which is the relevant criteria for purposes of the Medicare DSH payment. *See* AR 129-142 (testimony clarifying that MI and GAU patients were counted for Medicaid DSH payment purposes, and that Washington used its Medicaid DSH payments to pay for services provided to MI and GAU patients, but that MI and GAU patients were not eligible for Medicaid itself), 264-65 (state plan provisions regarding DSH payments on behalf of MI and GAU patients). That Washington may use its Medicaid DSH payments in order to fund the MI and GAU programs does not transform MI and GAU patients into Medicaid patients.

Based on the state plan's structure, it is clear that MI and GAU patients are counted for purposes of calculating Medicaid DSH payments, but are not actually directly eligible for federal funds under Medicaid. It is not their mention in the state plan that is relevant; the relevant issue is whether the MI and GAU programs directly receive federal matching funds under Medicaid. Because Washington's state plan does not confer Medicaid eligibility on MI and GAU patients, the administrator's finding that MI and GAU patients are not Medicaid patients is supported by substantial evidence.

The structure of Washington's state plan renders this case indistinguishable from the other two cases that have analyzed the "eligible for medical assistance under a State plan" language in the Numerator, *Adena* and *Phoenix Memorial*.

In both of those cases, state plans created programs that served certain populations of patients in addition to patients eligible for medical assistance under Medicaid. In *Adena*, Ohio's state plan required hospitals to provide charity care for certain indigent patients without receiving payment. This program was not a Medicaid program because the Medicaid program requires that the states pay providers. *See Adena*, 527 F.3d at 178. Thus, though the charity care program was

included in Ohio's state plan, the *Adena* court held that patients who received charity care were properly excluded from the Numerator calculation because they did not receive care under the *Medicaid program* in the state plan.

In *Phoenix Memorial*, Arizona's state plan also had two components: the Medicaid component and the state-funded component (with state eligibility requirements) for low-income patients who do not qualify for Medicaid under federal requirements. The plaintiff providers in *Phoenix Memorial* sought to include patients of the state-funded program in the Numerator, but the court found that those patients — even though they were included in the state plan — were not *eligible for Medicaid* under the state plan, and thus were properly excluded from the Numerator calculation. In this way, both *Adena* and *Phoenix Memorial* emphasize that for purposes of the Numerator it is not enough for a patient to be covered by a state plan: the patient must receive Medicaid benefits via the state plan in order to be counted in the Numerator.

In light of this court's conclusion that the administrator properly found that Washington's plan did not confer Medicaid eligibility on MI and GAU patients, the facts of *Adena* and *Phoenix Memorial* are indistinguishable from this case. Like the patient populations at issue in *Adena* and *Phoenix Memorial*, Washington's MI and GAU programs are part of the state plan, but the state plan does not provide that MI and GAU patients are eligible for Medicaid benefits. As such, the administrator properly determined that MI and GAU patients should not be counted in the Numerator calculation.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES Plaintiffs' motion for summary judgment (Dkt. # 12), and GRANTS the Defendant's motion (Dkt. # 15).

DATED this 30th day of September, 2009.

_____
The Honorable Richard A. Jones
United States District Judge